**DOW SCREW PRODUCTS, INC., Plaintiff,**

v.

**MET–FAB INDUSTRIES, INC., Defendant.**

**No. 79–889C(C).**

United States District Court, E. D. Missouri, E. D.

Jan. 8, 1981.

Barry Short, St. Louis, Mo., for plaintiff.

H. Kent Munson, St. Louis, Mo., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Findings Of Fact*

MEREDITH, District Judge.

1. Plaintiff Dow Screw Products, Inc. (hereinafter referred to as Dow) is a corpo-

ration organized under the laws of the state of Missouri with its principal place of business in Missouri and is engaged in the business of manufacturing metal parts.

2. Defendant Met-Fab Industries, Inc. (hereinafter referred to as Met-Fab) is a corporation organized under the laws of the state of Florida and is engaged in the business of selling metal working machinery.

3. Robert Ollinger, President of Dow, telephoned Harold Fischer, Chairman of the Board of Met-Fab, to inquire whether Met-Fab could sell Dow a used 1⅝" eight spindle cone automatic screw machine with a fifth position cross slide and a seventh position auxiliary reaming spindle in good working condition for making precision and close tolerance parts. Harold Fischer later informed Ollinger that he had located such a machine in good condition and offered to sell said machine to Dow for a price of $14,500.00. He further advised Dow that Met-Fab would guarantee the machine and that Dow would have a thirty-day return privilege on such machine. The thirty-day return privilege is a standard and customary option in sales of metal working machinery.

4. On February 22, 1979 Dow sent by wire the sum of $14,500.00 as full payment for the purchase price of said machine. On or about that same date Met-Fab sent their purchase order # 1077 to Gray Machinery, Inc. of Wheeling, Illinois for the purchase of a cone automatic screw machine at a price of $12,500.00 with a thirty-day return privilege.

5. After the money had been received and on or about February 22, 1979, Met-Fab sent its invoice # 1081 to Dow for the sale of the automatic cone screw machine which listed under the terms "as is" at a price of $14,500.00 which sum was acknowledged as having been paid in full.

6. The invoice with the term "as is" did not change the terms of the oral contract guaranteeing the machine and giving a thirty-day return privilege.

7. On or about March 12, 1979 the machine was delivered to Dow and Dow as-certained that the machine did not contain a fifth position cross slide or a seventh position auxiliary reaming spindle. The machine was not in good working condition to make precision and close tolerance parts. The entire stop mechanism and part of the feeding mechanism of said machine were missing. The machine had only two master tool holders instead of eight master tool holders; one spindle on the machine was bent and a pocket on one of the cross slides was cut out. The value of said machine to Dow was zero.

8. On March 12, 1979 Ollinger telephoned Harold Fischer to inform Met-Fab that Dow rejected said machine because it did not conform to the agreement made between Dow and Met-Fab. This was confirmed by mailgram on March 14, 1979 by Dow to Met-Fab.

9. On April 30, 1979 Mr. Robert R. Fischer of Met-Fab wrote a letter to Mr. Robert W. Rice, Chairman of the MDNA Committee on Ethic and Mediation, in which he stated as follows:

"Dear Mr. Rice:

We are in receipt of Ron Gray's response to our complaint against his firm, Gray Machinery, Inc. We feel that his letter is a further demonstration of his own immoral, unethical and illegal actions, which we have described to you, both orally and in writing.

For example, Mr. Gray stated that ' . . . our customer apparently rejected the machine on the basis that the equipment supplied with it was not correct.' *Well, it is true that the machine had to of had a 5th position cross slide and had to be a good working tool with no mechanical problems.* Without the above being correct, we could not have bought the machine, at any price. Thom Booth, Mr. Gray's emplouee, Mal, his partner, and Mr. Gray all made the same positive representations regarding this machine.

However, the machine was not as represented. It was, in fact, a 'piece of junk.' Enclosed please find a copy of our customer's Dow Screw Products, letter dated April 3, 1979. Mr. Ollinger, the President

of the Company, stated that 'one of the pockets had been cut out or mutilated on both cross slides, part of the feeding mechanism is missing, one of the spindles is severely bent, there are only two master tool holders, and the complete stock stop mechanism is missing . . . . .'

Secondly, Mr. Gray seems to be trying to create the impression that we knew all along that we were buying his machine "as-is," that we were told this in writing and had plenty of time to stop this transaction if we disagreed. The truth here is obviously quite simple. We sent a Purchase Order and Wire Transfer on February 22, 1979. Gray sent us a letter on March 6, 1979 (when the machine was being moved).

Finally, we paid $12,500.00, an outrageous price for this machine, if it were in excellent condition. Further, we bought this machine, 'sight-unseen,' based on Ron Gray's representation that the machine *was sound and with the standard 30 day return privilege.* Let's face facts, the man took our money and our Purchase Order, knowing full well the terms thereof. He merely sent us a letter with a weak denial, some weeks later, and after the fact, because he, better than anyone else, knew that the machine was 'junk' and that he had no intention of taking it back, once he had found a 'sucker' to take it off of his hands."

10. On April 3, 1979 Ollinger sent a letter to Met-Fab demanding an immediate refund of the $14,500.00 paid for said Machine. Met-Fab refused to refund any money.

11. Dow spent the sum of $356.00 for shipment of said machine to St. Louis, $852.00 for unloading and delivering the machine and reloading and transporting the machine for storage. It spent $30.00 per month from March 1979 through and including June of 1980 and the sum of $35.00 per month from July 1980 to date.

12. Plaintiff is entitled to a judgment against defendant in the sum of $14,500.00 plus $852.00 for unloading and delivering of said machine and reloading and transporting the machine for storage, plus $480.00 storage from March 1979 through June of 1980, and $210.00 storage from July 1980 through December of 1980. Plaintiff is not entitled to freight in the sum of $356.00 since under the return privilege the purchaser pays the freight.

*Conclusions of Law*

1. This Court has jurisdiction by virtue of 28 U.S.C. § 1332. Plaintiff and defendant are citizens of different states and the amount in controversy exceeds $10,000.

2. The law of the state of Missouri applies to this case as Missouri has had the most significant contact with this cause of action. Missouri Uniform Commercial Code, 400.2–101 through 725.

3. Defendant Met-Fab warranted the machine to be in good working condition. It was not and plaintiff is entitled to the amount it paid for the machine plus its incidental expenses except the shipping costs from Illinois.

4. The machine in question belongs to the defendant and it is responsible for any additional storage costs that may be incurred.